**SO ORDERED**

**SIGNED this 30 day of July, 2024.**

_____

**Pamela W. McAfee**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

ERIC SCOTT RANDOLPH and
ARLETTA SCOTT RANDOLPH,

     Debtors

Case No.
24-00048-5-PWM
Chapter 13

### ORDER SUSTAINING TRUSTEE'S OBJECTION
### TO DEBTORS' CLAIM OF EXEMPTION

The matter before the court is the trustee's objection to the debtors' claim of exemptions

with respect to two firearms that they contend qualify as "arms for muster" and can, on that basis,

be exempted under the common law of North Carolina as permitted by North Carolina General

Statutes § 1C-1601(f). The trustee filed his objection on March 8, 2024, D.E. 17, and the Randolphs

filed a response on March 22, 2024, D.E. 25. A hearing took place in Raleigh, North Carolina, on

June 27, 2024. The court took the matter under advisement at the conclusion of that hearing and,

for the reasons that follow, the trustee's objection will be sustained.

### PROCEDURAL BACKGROUND

Eric Scott Randolph and Arletta Scott Randolph filed a petition for relief under chapter 13

of the Bankruptcy Code on January 5, 2024. The Randolphs' Schedules A/B were timely filed and

included two firearms, both of which also were listed in their Schedule C-1. D.E. 1 at 25. The

Randolphs valued the firearms at $500 and claimed a corresponding $500 exemption in them under authority of N.C. Gen. Stat. § 1C-1601(f), which allows for "the exemptions provided by [the] … common law of this State." D.E. 1 at 28. In an explanation attached as an exhibit to their Schedule C-1, the debtors contend that in addition to specifically designated statutory exemptions (such as wages of a debtor necessary for support of family under N.C. Gen. Stat. § 1-362, which the debtors also claimed), common law property exemptions, "unless repealed, … could go back to pre-colonial English Common law." *Id*. at 30. According to the Randolphs, a survey of these circa-1900s exemptions indicates that while some common law exemptions for trade tools, clothing, household goods and the like have long been supplanted by statutory exemptions, "North Carolina does not appear … to have ever eliminated, narrowed or restricted the 'traditional' exemption for 'arms for muster.'" *Id*. Instead, it "simply quietly falls off the list of specifically enumerated exemptions." *Id.* The Randolphs maintain that an arms for muster exemption is both viable and available today because it remains supported by the common law of North Carolina. *See* N.C. Gen. Stat. § 1C-1601(f) ("The exemptions provided by this article and by other statutory or common law of this State shall apply for purposes of The Bankruptcy Code, 11 U.S.C. § 522(b)."). Finally, they contend that the specific guns at issue here are appropriately within the range of firearms that could be considered arms for muster.

Objecting, the trustee contends that the claimed exemption is impermissible because the Randolphs failed to establish that a *common law* "arms for muster" exemption ever existed, or, assuming that it did and assuming further that it still exists despite intervening codification, that the two firearms at issue come within it. At the hearing, the trustee acknowledged the two guns at issue are well suited for the defense of self and home, but continued to maintain that any common law arms for muster exemption that may have been previously recognized in this state is no longer

viable and that, even if it still existed, there is no showing that these firearms constitute "arms for muster." Accordingly, whether a recognized common law exemption for arms for muster ("AFM") is currently available to debtors under North Carolina state law, and whether these firearms could qualify for exemption pursuant to it, are the issues before the court.

The court appreciates the parties' thorough briefing of these intriguing questions, and the extensive historical research undertaken and shared by both the Randolphs and the trustee. The court had not previously had reason to explore the range of Nineteenth and early-Twentieth Century state law statutory exemptions for property and goods that ranged from horses to beds to bacon, and is gratified to have gained these insights.

## DISCUSSION

The Randolphs contend that common law recognized in North Carolina allowed an exemption for "arms for muster." They acknowledge that a statutory AFM exemption existed in the 1800s and then was removed from the statutory scheme in the early 1900s, but contend that because there was no "explicit legislative abrogation" of the exemption, it still exists by reason of its common law origin, and is available for use today. The trustee objects on grounds that he cannot verify a basis for the exemption in the common law of this state, and there is no longer any statutory exemption for arms for muster. Accordingly, while the evidentiary burden generally is on a trustee to prove a debtor's claimed exemption is improper, the threshold question here is not whether the AFM exemption applies to the Randolphs' firearms, but whether the exemption exists as a matter of law.

### Definitions and Historical Context

The court begins with definitions of the dispositive terms at issue: "arms for muster" and, of equal importance, what constitutes this state's "common law." "Arms," in the present context,

are understood to mean firearms such as handguns or rifles, with arms "for muster" being those used for purposes of assembling for "military inspection" and related exercises. As a verb, "to muster" means to convene, to enroll formally ("was mustered into the army"), or to collect, rouse or comprise a gathering. *See, e.g.*, Merriam-Webster.com. In this exemptions context, then, the issue is not whether the Randolphs may exempt an interest in firearms, which they may include within North Carolina's wildcard or household goods exemptions subject to certain dollar limitations, but whether North Carolina common law permits them to claim an exemption in arms *for muster* as its own category of exempt assets.

A state's "common law" is generally understood to be the body of law attributable to a body of judicial precedent, in contrast to statutory law. In North Carolina, "[o]ur General Assembly has declared that so much of the common law as has not been abrogated or repealed by statute or become obsolete is in full force and effect in this state." *State v. Vance*, 328 N.C. 613, 616-17, 402 S.E.2d 495, 498 (1991), citing N.C. Gen. Stat. 4-1. That section provides:

> All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, *and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete*, are hereby declared to be in full force within this state.

N.C. Gen. Stat. 4-1 (emphasis added). More specifically, "[t]he 'common law' referred to in N.C.G.S. 4-1 is the common law of England as of the date of the signing of the Declaration of Independence." *Vance*, 328 N.C. at 617, *quoted in State v. Lancaster*, 385 N.C. 459, 463-64, 895 S.E.2d 337, 341 (2023).

While the court may agree with the Randolphs that it is possible and even likely that arms for muster were once exempt from execution in this state pursuant to imported English common law, there are no cases before the court that confirm this. Although the Randolphs point to language

4

in *Hill v. Kessler*, 63 N.C. 437 (1869), which suggests that an arms for muster exemption originated in common law, that language is set forth in the dissent, and also appears to be a characterization of a party's position: "*It was urged on the argument*: By the common law, wearing apparel, arms for muster, tools of a tradesman, and a bed and furniture, are exempted; …then by Statute, certain other articles, i.e., Bible, hymn book, and school books, and finally a horse, not to exceed in all the value of $200, were exempted." *Id*. at 450 (Pearson, C.J., dissenting) (emphasis added). Even assuming the proponent of that argument was correct, the *Hill* decision itself makes clear that "[w]ith the policy of these exemptions this Court has nothing to do. If they are within the power of the Legislature, then it is sufficient for us that, 'thus is it written.'" *Id.* at 447.

While that imported body of common law was North Carolina's starting point, it is, as the *Hill* court pointed out, beyond dispute that "the General Assembly possesses the authority to displace the common law through legislative action" because "the General Assembly is the policy-making agency of our government, and when it elects to legislate in respect to the subject matter of any common law rule, *the statute supplants the common law rule and becomes the public policy of the state* in respect to that particular matter." *State v. McLymore*, 380 N.C. 185, 190, 868 S.E.2d 67, 72 (2022) (rejecting criminal defendant's argument that common law right to self-defense continued to exist separate and apart from statutory right to self-defense) (emphasis added). As the *McLymore* court also made clear, the General Assembly's intent to abolish or displace a common law right, or a common law exemption, may in some contexts be made apparent even when that intent is "not expressly stated." *Id*. (finding General Assembly's "intent to abolish the common law right to perfect self-defense [to be] unmistakable" where statute "closely tracks this earlier common law definition of the right" and does not contain a "carve out" to preserve common law rights).

With those definitions and parameters in mind, and for the reasons set out more fully below, the court concludes that while the AFM exemption may well have existed in North Carolina under circa-18th and 19th century common law, it no longer exists today under either statutory law or vestigial common law. The AFM exemption was codified in the mid-18th century, and by that action, this state's legislature supplanted any common law AFM exemption imported from England during the colonial era. Subsequent to that and at some point in the last two hundred years, the AFM statutory exemption was removed by either amendment or abrogation, as discussed below. Where any common law AFM exemption (assuming it existed) was first supplanted by legislation, and then extinguished when the legislature chose to not carry the exemption forward, the court cannot agree with the Randolphs that any AFM exemption somehow still remains viable purely by reason of its common law roots.

### Common Law Exemption Supplanted by Statute

The fuller context of an AFM exception, as established through the historical documents and statutes provided by the parties to the court, demonstrates that the possession of serviceable arms for muster was a specific civic requirement in colonial-era North Carolina and was first codified, as the Randolphs suggest, in 1808, when the legislature "seems for the first time to have added statutory exemptions for 'one bed and its necessary furniture' to be 'excepted like working tools and arms for muster.'" D.E. 25 at 2 (internal citations omitted). As the Randolphs acknowledge,

> [i]n the 1836 Revised Statutes of the State of North Carolina, Chapter 58 Sec. 1 on page 346 (numbered as page 322), these "traditional" exemptions were again expressly retained in the enumerated list. Eventually, the list of statutory exemptions was broadened, for example in the Law of North Carolina, 1841-1842, Chapter XXXIII at page 63 (adding, among other things an exemption for bacon), as well as in Laws of North Carolina, 1848-49, Chapter XXXVII, at page 91.

D.E. 25 p. 2. Arms for muster certainly were addressed by statute in approximately 1855, as follows: "The wearing apparel, working tools, arms for muster, one wheel and two pairs of cards, one loom, one [B]ible and testament, one hymn book, one prayerbook, and all necessary school-books, the property of the defendant, shall be exempt from seizure under execution." Trustee Exhibit A (Revised Code of North Carolina, Ch. 44 (executions), Art. 7 (articles exempt)) (available at archive.org/details/revisedcodeofnor1854nort). Those chapters on "Executions" also made plain that the provisions of the section – i.e., the exemptions – were not extended to any person against whom a judgment was obtained, and execution was awarded, for failure to work the roads, pay his poll tax, or "to muster." *Id*.

Roughly a decade later, and on the heels of the Civil War, similar provisions appear, albeit expanded:

> The wearing apparel, working tools, *arms for muster*, one wheel and two pairs of cards, one loom, one Bible and Testament, one hymn-book, one prayer-book, and all the necessary school books, the property of the defendant. Shall be exempt from seizure under execution, and in addition to the foregoing articles there shall be, in favor of every housekeeper complying with this chapter, exempt from execution on debts contracted [after July 1, 1845 and prior to February 25, 1867] the following property, provided the same shall have been set apart before seizure, to-wit: One cow and calf, ten bushels of corn or wheat, fifty pounds of bacon, beef, or pork, or one barrel of fish, all necessary farming tools for one laborer, one bed, bedstead and covering for every two members of the family, and such other property as the freeholders appointed for that purpose may deem necessary for the comfort and support of such debtor's family; such other property not to exceed in value the sum of fifty dollars at cash valuation: *Provided, that this section shall not be extended to any person against whom judgment is obtained and execution awarded for liability incurred for failure or neglect* to work on the public roads, or *to muster*, or pay his poll tax.

Trustee Ex. B (Revised Code of North Carolina, Revisal of 1905, Ch. 12 (Civil Procedure), Sec. 31 (Property exempt, etc.) (setting out exemptions applicable at varying points between July 1845 and after May 1, 1877)) (emphasis added).

7

Up until May 1, 1877, the exemptions were, by their terms, available to persons who complied with civic requirements to work on the public roads, pay poll tax, *and muster*. As was described at the hearing, the mustering requirement applied to white males under the age of 35, and specifically involved the act of assembly, with appropriate weaponry, for purposes of militia-related drills and exercise. Individuals required to enroll had to provide their own arms for muster and were subject to a fine for the failure to do so; on the positive side, an individual directed to "appear and muster as aforesaid" could not be liable for arrest on a civil matter while en route to or from the "place appointed to muster and appear," and was entitled to use ferries and toll-bridges free of charge while going to and from required "musters and reviews."  Trustee Ex. A, Ch. 7 (Militia), Sec. 1 (Who to be enrolled, and how provided); 6 (Persons enrolled to equip themselves, Forfeitures for neglect to equip.); 26 (Persons on muster ground failing to do duty, arrested); 27 (Persons attending musters, exempt from arrest in civil cases). It is apparent to the court that "arms for muster" pertains to historically-specific local and regional militia activity and to the arms required to serve that civic purpose, as opposed to arms a person might use for more personal reasons such as, for example, to hunt game to provide for a family.

### Statutory AFM Exemption Both Eliminated and Inapplicable

As discussed above, the AFM exemption was specifically linked to the civic requirement *to muster*, which itself was applicable only to white male North Carolinians in a certain age group. Neither the parties nor the court had need to engage in any deep research on this aspect of the issue because it is beyond question that those requirements, and those days, are over. Indeed, in the "Revisal of 1905," the General Assembly appears to have replaced the lists of exempted items described above with a more general homestead exemption that excepted the homestead from all debts other than a purchase mortgage, mechanics lien, or taxes. Trustee Ex. B, Ch. 12, Sec. 31.

The Randolphs, of course, do not argue that their firearms are used "to muster," and could provide no reported opinion to support their theory that the common law exemption still exists, or, for that matter, was ever a creature of common law.[1] Here, there is no dispute that any common law exemption ultimately was supplanted by a statutory one, and the statutory exemptions for AFM have come and gone. While the Randolphs maintain that an AFM exemption is not "repugnant to" the policies of this State and thus, by operation of N.C. Gen. Stat. § 4-1, remains in full force, the court finds that any common law exemption for AFM "has . . . been otherwise provided for in whole or in part, . . . abrogated, repealed, or become obsolete" as also contemplated by N.C. Gen. Stat. § 4-1.

In the Revisal of 1905, the legislature opted to not carry forward the AFM exemption (or any of the others it previously had authorized) and to instead provide for the general homestead exemption described above. The omission of the AFM exemption fits with the termination of the historical obligation to muster: today, North Carolina residents are not required, based on legislative specifications of age, sex, and race, to appear for musters and other military drills and

---

[1] The court further finds it significant that the North Carolina Constitution of 1868 specifically recognized the General Assembly's right to provide for exemptions, including AFM, as follows:

> The General Assembly may exempt cemeteries, and property held for educational, scientific, literary, charitable, or religious purposes; also wearing apparel, arms for muster, household and kitchen furniture, the mechanical and agricultural implements of mechanics and farmers, libraries and scientific instruments, or any other personal property, to a value not exceeding three hundred dollars.

N.C. Const. art. V, § 5. While the North Carolina Constitution has since been amended, the drafters of this version of the state constitution apparently did not perceive there to be an applicable common law AFM exemption, and instead contemplated that it could be adopted by statute – which it was, until it was later removed.

Interestingly, changes to the 1868 Constitution were put to a general election vote in 1969 and adopted in North Carolina's 1970 Constitution, which removes exemptions from article V, § 5 and instead provides for them in article X, § 1, as follows: "The personal property of any resident of this State, to a value fixed by the General Assembly but not less than $500, to be selected by the resident, is exempted from sale under execution or other final process of any court, issued for the collection of any debt." N.C. Const. art. X, § 1; *see* Committee Note.

exercises according to the specifications of a township or county or any other civic body. Nor is there a penalty imposed on those who fail to meet that requirement, and exemptions provided only to those who do meet it. The whole of the AFM exemption demonstrates a legislative priority, specific to a certain time and way of life, that no longer exists.

Still, the Randolphs contend that the legislature did not "take action to expressly or affirmatively eliminate, narrow, or restrict the 'traditional' exemption for 'arms for muster,'" and argue that "[r]equiring express, affirmative legislative action before the 'arms for muster' exemption at common law is properly considered 'abrogated or repealed' is entirely consistent with the general principle that 'legislative action' is necessary to displace rights established at common law." D.E. 25 at 3, citing *State v. McLymore*, 380 N.C. at 190. The court disagrees. The legislature took action to codify an AFM exemption and then, as is its perquisite, later took further affirmative action in *declining to carry the exemption forward when its usefulness and applicability waned.* Deleting a thing is an affirmative action, just as much as adding something. This is especially true where the common law exemption, if in fact it existed, would so obviously be obsolete.[2] *See* N.C. Gen. Stat. 4-1 (recognizing continued application of common law that was in use, and "which has not been *otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete*").

Further, the issue before the court does not involve "*rights* established at common law;" rather, it involves *exemptions*, both historical and current. The court perceives no basis on which the debtors' *rights* could be affected here, and it also bears noting that in the bankruptcy context, the exemption is in not the property itself, but in the value of the property. Subject to statutory

---

[2] While the Randolphs disputed that the common law exemption would today be limited to those used "for muster," they could not articulate how any common law AFM exemption that might now exist would be limited in type/use of firearm, number of firearms, or value, all of which are matters of policy better left to the legislature.

limitations, debtors in North Carolina remain free to exempt the value of their interests in firearms (or any other personal property they choose) using the household goods and wildcard exemptions as available.

### The Second Amendment Does Not Define Assets Subject to Exemption

Finally, the Randolphs argue that

> [t]he language of N.C.G.S. § 1C-1601(f) makes clear the Legislature's intent to preserve the exemptions provided by the 'common law of this State,' and the 'arms for muster' exemption in particular ultimately rests on the fundamental constitutional protections secured by the Second Amendment to the United States Constitution, in 'the right of the people to keep and bear arms' which 'shall not be infringed.' The North Carolina Constitution enshrines this right through the same language. N.C. Const., art. I, § 30.

D.E. 25 at 3.

The court cannot agree with the debtors that considerations pertaining to the Second Amendment have any relevance to the issue before it. As an initial matter, the Second Amendment speaks to the right "to keep and bear arms," without reference or limitation to the arms *for muster* referenced within North Carolina's early statutes. Further, the Bankruptcy Code imposes no fetters on the nature or number of the arms any debtor may possess. The claiming of an *exemption,* whether of statutory or common law origin, operates independently of and in no way impinges on the exercise of a constitutional right. Nothing in this opinion impacts a person's right to keep and bear arms. In this case, the debtors will retain their firearms but must include their value for purposes of the liquidation test under 11 U.S.C. § 1325(a)(4). The same would be true in an individual chapter 11 case. In the context of a liquidation under chapter 7, debtors may (and often do) negotiate a cash payment to the estate for the value of any non-exempt asset, including firearms. In sum, the Randolphs, like other debtors in this state, are free to apply North Carolina's other available exemptions toward firearms they own if they so choose.

11

**CONCLUSION**

For the foregoing reasons, the court concludes that any common law arms for muster exemption that may have existed in North Carolina was supplanted by the legislature's codification of that exemption approximately two hundred years ago, and because that statutory exemption became obsolete and no longer exists, the debtors may not claim an exemption in arms for muster. For policy reasons that are well within its realm, the General Assembly elected to not include arms for muster or any type of firearm within the statutory scheme it implemented in 1905, and has chosen not to adopt a specific firearm exemption since. This court cannot, without more, trace an exemption from the 1800s through to 2024, much less impose the related policy limitations on the type, number, and value of firearms that could or should be exempt.[3]

Because there is no existing exemption for arms for muster under North Carolina law, the trustee's objection to the debtors' claim of exemption is SUSTAINED. Nothing in this order prohibits the Randolphs from amending their claimed exemptions.

**END OF DOCUMENT**

---

[3] What property may be claimed as exempt from judgment execution or liquidation in bankruptcy is a policy decision relegated to the legislature. The United States Congress has not included a specific exemption for firearms in the Bankruptcy Code, 11 U.S.C. § 522(d), and, according to one resource, only fifteen percent of states have adopted explicit statutory exemptions for firearms, most of which are subject to limitations in number and value. Marcia Yablon, Why Annie Gets to Keep Her Gun: An Analysis of Firearm Exemptions in Bankruptcy Proceedings, 21 EMORY BANKR. DEV. J. 553, 556 (2005).